Argued and submitted November 8, 2011, affirmed July 25, 2012, *rev den*, 353 Or 208 (2013)

CLACKAMAS GROCERY OUTLET WAREHOUSE
and Grocery Outlet, Inc.,
*Petitioners,*

*v.*

OREGON LIQUOR CONTROL COMMISSION
and Oregon Beer And Wine Distributors Association,
*Respondents.*

Oregon Liquor Control Commission
OLCC08M001, OLCC08L011;
A145881 (Control), A145882

283 P3d 936

John DiLorenzo, Jr., argued the cause for petitioners. With him on the briefs were Aaron K. Stuckey and Davis Wright Tremaine LLP.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent Oregon Liquor Control Commission. On the brief were John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Tiffany Keast, Assistant Attorney General.

Paul R. Romain argued the cause for respondent Oregon Beer and Wine Distributors Association. With him on the

brief were The Romain Group, LLC, Margaret E. Schroeder, John A. Hirschy, and Black Helterline LLP.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

Petitioners, Clackamas Grocery Outlet Warehouse and Grocery Outlet, Inc., (GOI),[1] seek judicial review of a final order of the Oregon Liquor Control Commission (OLCC), in which the OLCC determined that GOI's business practice of receiving and storing wine at its Clackamas warehouse and delivering it to GOI retail stores throughout Oregon for sale to the public was not permitted.[2] The order also granted GOI an "off-premises sales license" (O license), *see* ORS 471.186, for its Clackamas facility, subject to certain restrictions consistent with that determination—that is, the O license specifically allows the sale of alcoholic beverages "only at retail directly to the consumer for off-premises consumption" and "does not authorize activities associated with the wholesale sale and distribution of alcoholic beverages to other licensed premises." GOI petitions for judicial review of the OLCC's order. For the reasons stated below, we affirm.

## I. STATUTORY FRAMEWORK

To give necessary context to this dispute, we begin with a discussion of the statutory scheme established by the Liquor Control Act (the Act), ORS chapter 471; ORS 474.105; ORS 474.115; *see* ORS 471.027, and, in particular, the applicable licensing provisions.[3] The OLCC is authorized by the legislature "[t]o control the manufacture, possession, sale, purchase, transportation, importation and delivery of alcoholic liquor in accordance with [the Act]." ORS 471.730(1). It has the power and duty "[t]o grant, refuse, suspend, or cancel licenses and permits for the sale or manufacture of alcoholic liquor, or other licenses and permits in regard thereto[.]" ORS 471.730(2).

---

[1] Clackamas Grocery Outlet Warehouse and Grocery Outlet, Inc., are each named as petitioners in this case; however, according to GOI's brief, Clackamas Grocery Outlet Warehouse is a location owned by Grocery Outlet, Inc., and not a separate entity. We refer to petitioners collectively throughout his opinion as GOI.

[2] As described in more detail below, 251 Or App at 335, the stores are owned or leased by GOI but are operated by independent store operators under contract with GOI.

[3] Some of the statutes cited in this opinion have been amended since the events that gave rise to this review occurred. However, none of those amendments affects our analysis in this case; therefore, for convenience, we cite the current versions throughout this opinion.

A person who is not licensed under the Act may not "sell, solicit, take orders for or peddle alcoholic beverages." ORS 471.405(3). Moreover, "[n]o licensee shall sell or offer for sale any alcoholic beverage in a manner, or to a person, other than the license permits the licensee to sell." ORS 471.405(1). Significantly, under ORS 471.406:

"Any prohibition on the sale of alcoholic beverages provided for in this chapter includes:

"(1) Soliciting orders for alcoholic beverages or receiving orders for alcoholic beverages.

"(2) Keeping alcoholic beverages for sale or exposing alcoholic beverages for sale.

"(3) Delivering alcoholic beverages for value or in any way other than purely gratuitously.

"(4) Peddling alcoholic beverages.

"(5) Keeping alcoholic beverages with intent to sell.

"(6) Trafficking in alcoholic beverages.

"(7) For any consideration, promised or obtained, directly or indirectly, or under any pretext or by any means, procuring alcoholic beverages, or allowing alcoholic beverages to be procured, for any other person."

The Act authorizes various types of licenses, two of which are most pertinent to the issues raised in this case: (1) the "off-premises sales license," which, as noted, is referred to as an "O license," ORS 471.186; and (2) the "wholesale malt beverage and wine license," ORS 471.235. As discussed below, 251 Or App at 335, 338, GOI holds an O license (jointly with the store operator) for each individual GOI retail store and, as of October 2008, also has an O license for its Clackamas warehouse. GOI does not have, and never has had, a wholesale malt beverage and wine license.

ORS 471.186 establishes the O license. Subsection (1) of that statute provides, in part:

"The holder of an off-premises sales license may sell factory-sealed containers of wine, malt beverages and cider."[4]

---

[4] In contrast, a "full on-premises sales license" permits the holder to "sell by the drink at retail wine, malt beverages, cider and distilled liquor" generally to "be consumed on the licensed premises." ORS 471.175(1).

The holder of an O license may also provide "sample tastings" on the licensed premises with the approval of the OLCC, ORS 471.186(2), and "may deliver wine or cider that is sold under the privileges of the license to retail customers in this state" as long as—among other restrictions—such deliveries are "made only for personal use and not for the purpose of resale," ORS 471.186(5), (5)(b). In addition, ORS 471.305 provides that "[t]he sale of alcoholic liquors under any license issued by the [OLCC] authorizing retail sales by a licensee shall be restricted to the premises described in the license, but deliveries may be made by the licensee to customers pursuant to bona fide orders received on the licensed premises prior to delivery." "Premises" or "licensed premises" is defined to mean

> "a location licensed under [chapter 471] and includes all enclosed areas at the location that are used in the business operated at the location, including offices, kitchens, rest rooms and storerooms, including all public and private areas where patrons are permitted to be present. 'Premises' or 'licensed premises' include areas outside of a building that the commission has specifically designated as approved for alcoholic beverage service or consumption."

ORS 471.001(10).

Wholesale malt beverage and wine licenses are governed by ORS 471.235. That license allows, among other activities, "the importation, storage, transportation, wholesale sale and distribution to licensees of the [OLCC]." ORS 471.235(1). The licensee "may not sell any alcoholic liquor for consumption upon the licensed premises." *Id.*

Also of significance to this case are the so-called "tied-house" provisions, ORS 471.392 - 471.400, which, the OLCC contends, "prevent licensees from combining the features of one type of license with the features of another type of license, as well as from entering into certain business arrangements with other licensees." In particular, and subject to a myriad of exceptions not relevant here,[5] ORS 471.394 provides that

---

[5] For example, the prohibition in subsection ORS 471.394(1) against selling at both retail and wholesale does not apply to some "manufacturer or wholesaler" licensees *to the extent that retail sales are authorized by the statutes establishing the privileges of [the] license."* ORS 471.396(1) (emphasis added). To illustrate: A person holding a winery license is defined as a manufacturer or wholesaler under

"a person licensed under the provisions of [chapter 471] may not sell alcoholic liquor at both retail and wholesale," ORS 471.394(1), and a manufacturer or wholesaler is prohibited from having any interest, "financial or otherwise," in the "premises, equipment, business or merchandise" of a retail licensee, and vice versa, ORS 471.394(2), (3).

For purposes of the tied-house provisions, an O license is a retail license. ORS 471.392(2) ("'Retail licensee' means the holder of a full or limited on-premises sales license, an off-premises sales license or a temporary sales license."). A "manufacturer or wholesaler" is defined, in part, as

"[a] person holding a brewery license issued under ORS 471.220, a winery license issued under ORS 471.223, a grower sales privilege license issued under ORS 471.227, a distillery license issued under ORS 471.230, a wholesale malt beverage and wine license issued under ORS 471.235 or a warehouse license issued under ORS 471.242."

ORS 471.392(1)(a).

Finally, ORS 471.030(1) provides:

"The Liquor Control Act shall be liberally construed so as:

"(a)   To prevent the recurrence of abuses associated with saloons or resorts for the consumption of alcoholic beverages.

"(b)   To eliminate the evils of unlicensed and unlawful manufacture, selling and disposing of such beverages and to promote temperance in the use and consumption of alcoholic beverages.

"(c)   To protect the safety, welfare, health, peace and morals of the people of the state."

## II.   FACTUAL AND PROCEDURAL HISTORY

We take the facts, which are undisputed, from the OLCC's final order. *See Jefferson County School Dist. No.*

---

ORS 471.392(1)(a). However, the statute establishing the winery license, ORS 471.223, also allows the licensee to "sell wines or cider at retail directly to the consumer for consumption on or off the licensed premises," ORS 471.223(1)(c), and to "sell malt beverages at retail for consumption on or off the licensed premises," ORS 471.223(1)(d).

*509-J v. FDAB*, 311 Or 389, 393 n 7, 812 P2d 1384 (1991) (unchallenged findings of fact are the facts for purposes of judicial review of an administrative agency's final order). We begin by quoting verbatim the OLCC's findings regarding GOI's wine purchasing, storage, and delivery system:

> "GOI purchases wine at wholesale from suppliers licensed by the OLCC. GOI stores the wine at its Clackamas facility until it delivers the wine to retail stores that operate under the trade name Grocery Outlet. These retail stores each have separate off-premises retail sales licenses held jointly by the store operator and GOI. * * *

> "The operators of the Grocery Outlet retail stores operate the stores under contracts with GOI. The operators receive wine from GOI's Clackamas facility and sell the wine at retail under 31 separate off-premises retail sales licenses held jointly with GOI and the operators of individual stores.

> "GOI retains title to the wine transported from GOI's Clackamas facility to the 31 Grocery Outlet retail stores until the wine is sold by the retail store. At that time, title is transferred to the retail customer. The proceeds of the sale of wine are at all times the property of GOI, subject to the right of the independent store operator to receive a commission. No money is transferred from the retail store to GOI until after the wine is sold to the public. The retail store operator is paid only after the wine is sold to the public."

(Paragraph numbering, record citations, and footnotes omitted.) The OLCC also found that,

> "[p]ursuant to the contract between GOI and its independent store operators, 'GOI procures, distributes and consigns merchandise.' The independent store operator is responsible, 'as consignee of GOI merchandise, for the operation of the retail store and for the safe and efficient handling and sale of GOI merchandise. * * * Operator is not an employee of GOI, nor is Operator a franchisee, partner, reseller or owner with GOI.' Operators receive, as a commission from GOI, a percentage of the store's gross margin, generated from the sale of merchandise."

(Omission in original; record citation omitted.)

GOI maintained this purchasing and delivery system, using its Clackamas facility[6] or similar locations to receive and store wine and beer, for over 20 years.[7] In 1986, the OLCC acknowledged that GOI's business model was permissible; in particular, the OLCC wrote, in a May 20, 1986, letter:

> "[N]othing in the method of distribution of beer and wine by [GOI] suggests any conflict with the Liquor Control Act or Administrative Rules of this state. Our understanding is that the [GOI] warehouse merely consigns, and does not sell beer and wine to retail stores. We further understand that there is no fee or charge associated with the delivery of beer and wine to the retail stores."

Questions about GOI's system began to surface in 2005, and, in 2007, counsel for the Oregon Beer and Wine Distributors Association (OBWDA), sent an e-mail message notifying its members of the following:

> "The [OLCC] no longer allows the central warehousing of wine by a retailer. The [OLCC] determined that wine may only be delivered to a licensed retail account, and the retail license does not allow the retailer to transport wine or beer from one licensed location to another, even if the two locations are owned by the same entity. Malt beverages also may not be delivered to a central warehouse.
>
> "The new law on direct delivery of wine by an out-of-state winery to an Oregon retailer also has a specific provision in it that the wine must be delivered to a licensed retail location, not a central warehouse. As with wine or beer delivered by an Oregon winery, brewery or wholesaler, the beverages may not be transported by the retailer from one licensed location to another.
>
> "Please review your delivery practices and determine if you are delivering product to a central warehouse. If so, please end the practice."

Shortly thereafter, GOI's wholesale distributors refused to process orders for delivery to GOI's Clackamas facility.

---

[6] GOI did not hold any OLCC license for the Clackamas facility until 2008, when, as described below, 251 Or App at 337-38, GOI received a temporary O license for that facility.

[7] In 2008, GOI stopped using this system for storing and transporting beer to GOI retail stores.

On January 30, 2008, the OLCC sent a letter to GOI's counsel, confirming that "it has been the OLCC's position for at least the past several years that the practice of central warehousing of alcoholic beverages by retailers is not authorized under Oregon law." Recognizing, however, that GOI could "reasonably have relied" on the 1986 letter that "seems to authorize the practice," the OLCC stated that it would not take any enforcement action against GOI or its suppliers for 90 days. Distributors then resumed delivering wine to GOI's Clackamas facility.

In April 2008, GOI applied for a temporary O license for the Clackamas facility, which GOI proposed to open for retail sales to the public on Fridays for two to three hours, but which would also receive and store products for other GOI locations. In a letter dated May 9, 2008, the OLCC informed GOI that that "the warehouse activities being proposed at the Clackamas location are not consistent with the O license privileges" and that, "[i]n order to operate under an O license, [GOI] would need to discontinue the warehouse activities at the Clackamas location and conduct only retail sales at that location." The OLCC also extended the deadline for compliance to July 26, 2008. Before that deadline, GOI filed an action in Clackamas County Circuit Court and obtained an injunction preventing the OLCC from taking any adverse action against GOI based on the positions taken by the OLCC in its January 30 and May 9, 2008, letters.[8]

---

[8] The injunction was later amended to allow OLCC to issue an O license to GOI with the restrictions described in a letter dated October 14, 2008, 251 Or App at 338, and to allow GOI to appeal those restrictions though the appropriate administrative and legal venues. The OLCC and GOI also stipulated to the following:

"The OLCC will not take the position, in the pending administrative proceeding or any administrative proceeding stemming from the OLCC's action on [GOI's] pending license application or in any appeal from such administrative proceedings[,] that [GOI] is not authorized to store wine and beer at a central location and ship it thereafter to other locations because of the restrictions contained [in the O License for the Clackamas facility]. In addition, if it is determined by final administrative or appellate decision in the [p]roceedings that a standard, unrestricted 'O' License allows a licensee to engage in storage and shipping of beer or wine to other locations, then the OLCC will remove the restrictions from the Restricted 'O' License issued to Grocery Outlet."

On October 14, 2008, the OLCC issued a letter indicating its approval of GOI's application for an O license at the Clackamas facility, subject to the following restriction:

> "This license allows the sale of alcoholic beverages only at retail directly to the consumer for off-premises consumption. It does not authorize activities associated with the wholesale sale and distribution of alcoholic beverages to other licensed premises. Specifically, the following are prohibited: storing alcoholic beverage products except for products that will be sold to consumers at this location; wholesale sale of alcoholic beverage products (this means selling product to a person who will not consume the product but instead intends to resell it); and transportation or distribution of alcoholic beverage products to other licensed premises."

However, based on the Clackamas County Circuit Court's injunction, the OLCC agreed "not to take action to enforce this restriction until after the conclusion of any administrative proceeding involving this restriction, including any appeal."

GOI timely requested a contested case hearing on the January 30 and May 9, 2008, OLCC letters (the charging documents) and with respect to the restrictions imposed on the O license for the Clackamas facility. The matters were consolidated for hearing, and OBWDA was granted permission to participate as a party.

The parties filed cross-motions for summary determination, and, after oral argument on the motions, the administrative law judge (ALJ) issued a proposed order recommending that the OLCC authorize GOI to continue the purchasing and delivery practices described above and grant GOI's application for an unrestricted O license at the Clackamas facility. The ALJ rejected the OLCC and OBWDA's argument that GOI was, through its activities at the Clackamas facility, operating as an unlicensed wholesaler in violation of the statutory tied-house prohibitions, in particular, ORS 471.394(1), which, as noted, generally proscribes the sale of "alcoholic liquor at both retail and wholesale." The ALJ also concluded that nothing in the Act "specifically prohibits a retail licensee from storing wine at an unlicensed location for eventual

sale at licensed premises"; therefore, GOI was not required to obtain a separate license for the Clackamas facility, and, concomitantly, the restrictions imposed on GOI's O license were not necessary or justified under OAR 845-005-0355.[9] Both OBWDA and the staff of the OLCC registered objections to the proposed order.

The OLCC issued a final order that rejected the conclusions reached by the ALJ. It explained that, under the "three-tier" regulatory system established by the legislature, involving distinct separations among manufacturers, wholesalers, and retailers, and including the tied-house provisions, "[n]o license may be used in a way that would allow the holder of that license to perform activities that are the province of another license in another tier[.]" Consistently with that fundamental premise, and invoking as well the purposes of the Act, the OLCC concluded that (1)

"[b]y using the Clackamas warehouse facility as a distribution hub for wine to its 31 Oregon locations, [GOI] is engaging in wholesale alcohol sales in violation of ORS 471.405 (selling alcohol in a manner 'other than the license permits the licensee to sell') and ORS 471.394 (prohibition on selling at both wholesale and retail)";

and (2) the restrictions that the OLCC imposed on the O license for GOI's Clackamas facility are appropriate under OAR 845-005-0355 because they are needed to "prevent GOI from conducting activities that are outside the scope of the O license and are reserved to licensed wholesalers." Consequently, the OLCC's final order granted the OLCC's and OBWDA's motions for summary determination, denied GOI's, and ordered that "[GOI] is not authorized to continue its business practice of receiving and storing wine at the Clackamas facility and delivering it to [GOI] retail stores throughout Oregon for sale to the general public." The final order also granted GOI an O license for the Clackamas facility subject to the restrictions described above. GOI seeks judicial review of that final order.

---

[9] That rule allows the OLCC to place restrictions on a license in certain circumstances, including when, for example, the restriction "is in the public interest or convenience," OAR 845-005-0355(1)(c); one of the factors relevant to that determination is "the need to eliminate or prevent conditions that have contributed to or that the [OLCC] reasonably believes will contribute to liquor or criminal law violations by the licensee[,]" OAR 845-005-0355(2)(b).

## III. ANALYSIS

On review, GOI asserts that the OLCC erred in concluding that GOI's wine distribution system is not authorized and, as a result, the OLCC also necessarily erred in approving the restrictions in the O license issued for the Clackamas facility. GOI challenges each of the three bases for the OLCC's conclusion that GOI's wine-purchasing and distribution system is not permitted, namely:

"([1]) the storage and distribution of wine are activities which are outside of the privileges of the O retail license and are reserved to wholesale licensees; ([2]) GOI's activities with respect to wine may not be conducted from an unlicensed location; and ([3]) the Tied House laws, in particular ORS 471.394, prohibit GOI, as a retail licensee, from engaging in the wholesale sale and distribution of wine to other retail outlets."

It also argues that, absent a statutory prohibition against it, the OLCC's 2008 policy on "central warehousing" of wine constitutes a rule under ORS 183.310(9), "which can only be adopted by formal rulemaking."

We review the dispute in this case, which turns on the meaning of various provisions in the Act, for legal error. ORS 183.482(8)(a). As explained below, we agree with the OLCC that GOI's practice of storing wine at its Clackamas facility and distributing it to GOI stores is prohibited by its O retail licenses for its stores and, therefore, that the license restrictions for the Clackamas facility are appropriate. That conclusion necessarily also negates GOI's argument regarding the requirement for formal rulemaking. Accordingly, we affirm.

As an initial matter, GOI contends that the OLCC's analysis is flawed generally because it is driven by the "three-tier system" concept, rather than actual statutory text. More specifically, GOI contends that the OLCC's underlying premise—that activities not specifically permitted by the statute governing the O retail license, such as, as relevant here, "storage," "transportation," and "delivery," are reserved for other tiers and therefore prohibited by the O license—is, first, not supported by statutory authority and, second, contradicted by the fact that, as acknowledged by the OLCC, some level of those activities *are* allowed under

an O retail license. For example, as GOI points out, and the OLCC acknowledges, O licensees unavoidably "store" some quantity of wine as a component of their retail operations, even though ORS 471.186 does not specifically authorize "storage." Similarly, as noted above, O licensees are expressly authorized to engage in some delivery or transportation of wine. *See* ORS 471.186(5); ORS 471.305; OAR 845-006-0390. Moreover, GOI contends, such an interpretation of the scheme "would lead to utterly absurd results"; for example, as noted by the ALJ, the "retail sales license statutes also [do] not expressly authorize holders to *purchase* the alcoholic beverages to be sold at retail." (Emphasis in original.)

The OLCC and OBWDA, on the other hand, contend that the OLCC's interpretation of the statutory scheme is correct. Focusing on the text and context of the Act—including the legislative embodiment of a three-tier system and the enactment of the tied-house provisions—the OLCC contends that "the legislature intended to keep separate the activities of retailers, wholesalers and manufacturers and to allow their overlap only where expressly authorized." Thus, in the OLCC and OBWDA's view, the Act "prohibit[s] any activity that is not expressly authorized." (Boldface omitted.) It follows that, because GOI has failed to identify any statutory authority for "us[ing] its Clackamas facility for storage, transport, or delivery of wine to retail locations for resale," it is acting unlawfully.

In short, GOI takes the overarching position that activities not specifically prohibited by the Act are allowed, while the OLCC and OBWDA contend that privileges not expressly granted to a particular license by the Act are prohibited. Neither of those absolutes withstands serious scrutiny. However, we need not reconcile the parties' absolutist positions in order to decide this case.

As mentioned, ORS 471.405(1) provides that "[n]o licensee shall sell or offer for sale any alcoholic beverage in a manner, or to a person, other than the license permits the licensee to sell." In turn, ORS 471.406—while not strictly a definition of the word "sell"—establishes the breadth of "[a]ny *prohibition* on the sale of alcoholic beverages" otherwise provided for in chapter 471 (emphasis added); that range

includes a variety of activities that would not necessarily be encompassed under an ordinary understanding of the word.[10] ORS 471.405(1) is such a "prohibition"—it expressly bans the sale of alcoholic liquor "in a manner, or to a person, other than the license permits the licensee to sell" and it appears in chapter 471. Thus, by virtue of ORS 471.406, ORS 471.405(1)'s "prohibition on sale" beyond what is permitted by the pertinent license includes, *inter alia*, "[k]eeping alcoholic beverages with intent to sell." ORS 471.406(5).

The word "sell," as used in the phrase "intent to sell," undoubtedly invokes the ordinary meaning of the term—it is not itself a "prohibition on the sale" of alcohol contained in chapter 471; moreover, to conclude otherwise would be endlessly circular—thus, the prohibition against selling wine "in a manner, or to a person, other than the license permits the licensee to sell" includes keeping wine with the intent to "give up to another for money or other valuable consideration or to hand over or transfer title to." *Ban v. OLCC*, 196 Or App 545, 552, 102 P3d 744 (2004) (internal quotation marks omitted).

GOI readily acknowledges that it is engaged in retail selling of wine at each of the independently operated GOI stores[11] and that it stores wine for those sales at its Clackamas facility. Nonetheless, GOI contends that the wine held at the Clackamas facility is not kept with the intent to sell, "but rather is simply kept in storage pending a decision to move it to a retail location." That argument is without merit. Given the undisputed findings in this case, there can be no question that GOI purchases the wine and stores it in the Clackamas facility for the purpose of "giv[ing it up] to another"—the consumer in the store—in exchange "for money" or "transfer[ring] title."[12] That the wine is stored for

---

[10] *Cf. Ban v. OLCC*, 196 Or App 545, 552, 102 P3d 744 (2004) (applying plain meaning of the term "sell"—that is, "to give up to another for money or other valuable consideration or to hand over or transfer title to"—in construing the meaning of "sell" in ORS 471.480(1), which *permits* the sale of alcohol by an employee of an O licensee who is at least 18 years of age (internal quotation marks omitted)).

[11] For that reason, GOI would not be able to obtain a wholesale license for the Clackamas facility without violating the prohibition in ORS 471.394(1) against selling at both wholesale and retail.

[12] As noted, the OLCC found—and GOI does not dispute—that "GOI retains title to the wine transported from GOI's Clackamas facility to the 31 Grocery

a time until the decision is made to move it to a particular location does not speak to a different "intent." The question, therefore, reduces to whether that prohibited activity is otherwise permitted by GOI's licenses.

We conclude that it is not. An O license permits its holder to "sell factory-sealed containers of wine," ORS 471.186(1); to provide "sample tasting" on the licensed premises with the OLCC's approval, ORS 471.186(2); and to "deliver" wine to retail customers for personal use, ORS 471.186(5). Under ORS 471.305, an O licensee is also permitted to deliver wine to customers "pursuant to bona fide orders received on the licensed premises prior to delivery." And, the OLCC's rules permit an O licensee to transport wine from a licensed wholesaler's premises back to the retailer's licensed premises. *See* OAR 845-006-0390 (authorizing "dock sales" of wine). Thus, those activities are "permitted" by the O license; others—to the extent they are encompassed within the meaning of "sales" in ORS 471.406 (and not otherwise allowed under other provisions of the Act)—are prohibited.[13]

In addition, ORS 471.305 further provides that "[t]he sale of alcoholic liquors under any license issued by the [OLCC] authorizing retail sales by a licensee *shall be restricted* to the premises described in the license." (Emphasis added.) Because, as we have discussed, a prohibition on the sale of alcohol in chapter 471 includes "[k]eeping alcoholic beverages with intent to sell," ORS 471.406(5), it follows— reading ORS 471.305 in conjunction with ORS 471.406(5)— that that activity is restricted to the licensed premises. The term "licensed premises" is defined to include "all enclosed

---

Outlet retail stores until the wine is sold by the retail store. At that time, title is transferred to the retail customer."

[13] That conclusion is borne out by the context of the statute. In particular, and in contrast to the O license, activities such as "storage" and "transportation" are "permitted by the license" in the context of *other* licenses established under the Act. For example, the following licenses all explicitly allow some storage and transportation activities: wholesale malt beverage and wine license, ORS 471.235; brewery-public house license, ORS 471.200; brewery license, ORS 471.220; winery license, ORS 471.223; grower sales privilege license, ORS 471.227; and warehouse license, ORS 471.242. This further demonstrates the legislature's intent not to permit such activities under an O license.

areas at the location that are used in the business operated *at the location*, including offices, kitchens, rest rooms and *storerooms.*" ORS 471.001(10) (emphasis added). Thus, each of GOI's licenses permit it to "keep wine with the intent to sell it" only on the premises described in that license. That includes the O license for the Clackamas facility: under that license, GOI is permitted to keep wine at the facility only for sale at that facility. In sum, we conclude that the OLCC did not err in determining that GOI's practice of storing wine at its Clackamas facility and transporting it for sale at its retail stores was not permitted and that, consequently, the restrictions on GOI's O license for the Clackamas facility were lawful.[14]

Our conclusion in that regard also disposes of GOI's argument regarding the need for formal rulemaking. Specifically, GOI's thesis is that

"[a]*bsent a statutory prohibition* [on GOI's practice of storing wine at its Clackamas facility and transferring it to its retail stores], the OLCC's new position on 'central warehousing' constitutes [a rule under ORS 183.310(9)], which can only be adopted by formal rulemaking (assuming the OLCC even has the authority to adopt such a rule)."

(Emphasis added.) As just explained, GOI's practice is prohibited by ORS 471.405(1), ORS 471.406, and ORS 471.305. Accordingly, we reject GOI's thesis.

## IV. CONCLUSION

The OLCC did not err in (1) ordering that GOI is not authorized to continue its practice of receiving and storing wine at its Clackamas facility for delivery to GOI retail stores and (2) granting GOI an O license for its Clackamas facility with the restrictions described.

Affirmed.

---

[14] GOI does not contend that, even if, as we have concluded, the OLCC correctly ruled that GOI's operation is not permitted, the license restrictions are nonetheless unwarranted for some other reason.